# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 08-1758

IVAN R. SELLERS, APPELLANT,

V.

ERIC K. SHINSEKI,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued November 9, 2011                    Decided June 26, 2012)

*Douglas J. Rosinski*, of Columbia, South Carolina, with whom *James E. Swiger*, of Centreville, Virginia, was on the brief for the appellant.

*James B. Cowden*, with whom *Will A. Gunn*, General Counsel; *R. Randall Campbell*, Assistant General Counsel; and *Richard Mayerick*, Deputy Assistant General Counsel, all of Washington, D.C., were on the brief for the appellee.

Before KASOLD, *Chief Judge*, and HAGEL and SCHOELEN, *Judges*.

SCHOELEN, *Judge*, filed the opinion of the Court. KASOLD, *Chief Judge*, filed an opinion concurring in the result.

SCHOELEN, *Judge*:  The appellant, Ivan R. Sellers, through counsel, appeals an April 2, 2008, Board of Veterans' Appeals (Board or BVA) decision in which the Board determined that a July 14, 1988, rating decision did not contain clear and unmistakable error (CUE). Record (R.) at 18. The Board also confirmed that the appellant was not entitled to an effective date earlier than February 5, 2004, for service connection for retinitis pigmentosa (RP),[1] as found by the January 31, 2005, Houston VA regional office (RO) decision. *Id.* Both parties filed briefs, and the appellant filed a reply brief. It was later revealed that a June 1, 2004, rating decision had found CUE in the July 1988 rating decision and awarded a March 25, 1988, effective date for service connection for

---

[1] "Retinitis Pigmentosa" is "a group of diseases, frequently hereditary, marked by progressive loss of retinal response . . . , retinal atrophy, attenuation of the retinal vessels, and clumping of the pigment, with contraction of the field of vision." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1634 (32d ed. 2012) [hereinafter DORLAND'S].

RP. R. at 287-93. A limited remand from this Court to the Board resulted in a June 29, 2011, supplemental Board decision in which the Board determined that the June 2004 rating decision was authentic, but only a draft decision. *See Ivan Sellers*, BVA 08-1758, at 10, 12 (June 29, 2011). Thereafter, the parties filed supplemental briefs. This appeal is timely, and the Court has jurisdiction to review the Board's decision pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). Because the Court finds that the June 2004 RO decision binds VA and the January 2005 RO decision is void ab initio, the Court will set aside the Board's April 2008 decision and reverse in part and affirm in part the Board's June 29, 2011, supplemental decision.

## I. FACTS

### A. Claim for Entitlement to Service Connection for RP

The appellant served on active duty in the U.S. Army from January 1966 to October 1973. R. at 304. In his November 1965 medical history report, the appellant attested that he had a history of eye trouble and that he wore eyeglasses. R. at 466-67, 481. The enlistment examination report observed that the appellant's visual acuity, refraction, pupil equality and reaction, and ocular motility all appeared in normal condition. R. at 484. These impressions were confirmed in the appellant's September 1973 separation examination, which concluded that all visual functions were normal. R. at 454.

Nine days after the appellant's separation examination, an ophthalmology examination was conducted because he complained of flashing lights in his left temporal field and a restricted field of vision. R. at 456. The examiner observed that the appellant had suffered visual field contraction and retinal pigment epithelium (RPE) "defects."[2] *Id*. The examiner concluded, however, that "no pathology" existed. R. at 456.

In June 1982, a private physician diagnosed the appellant with RP. R. at 500. The physician described the condition as "a collection of disorders which are characterized by night blindness, peripheral visual loss, and, in the later stages of the disease, central vision problems, color vision problems, and reading difficulties." *Id*. The physician advised that the condition is almost always

---

[2] RPE is the outer pigmented layer of the optical part of the retina that extends from the entrance of the optic nerve to the pupillary margins of the iris. *See* DORLAND'S at 1781.

2

hereditary, but that the appellant had "no specific evidence of similar problems in other members of [his] family." *Id.*

In March 1988, the appellant filed a claim for entitlement to disability compensation for RP with cataracts. R. at 488-94. In July 1988, the RO issued a rating decision denying the claim. R. at 451-52. The RO explained the relevant facts as follows:

> On separation exam[ination], [the veteran] complained of decreased peripheral vision and decreased night vision, and op[h]thalmological evaluation also showed complaints of flashing lights in the left temporal field. No definite pathology was found. [Private physician] reports show [the veteran] has progressive bilateral retinitis pigm[e]ntosa and has undergone bilateral catara[c]t extraction. There is no evidence of eye trauma in service.

R. at 452. The RO concluded that the appellant's condition was a constitutional or developmental abnormality (CDA) and that it was not aggravated in service. *Id.* The September 1988 Statement of the Case (SOC) explained that the appellant's RP was a CDA, and CDAs "can only be service-connected by aggravation."[3] R. at 447. To establish service connection by aggravation, the RO continued,

> [i]t must be actively shown that the condition was made worse by some specific portion of the veteran's military service and made worse at a rate faster than the normal progression of the condition. There is no evidence that the veteran's condition was in any way aggravated by his military service or caused to progress faster than his normal progression by that military service.

*Id.* The appellant failed to perfect an appeal and the decision thus became final.

In February 2004, the appellant filed a statement arguing that the July 1988 RO decision was premised upon CUE. R. at 410-11. VA construed the appellant's filing as both a request to reopen his claim and a request to revise the July 1988 RO decision because of CUE. R. at 15, 346.

### B. The Houston RO's Claim Processing: February 2004 to September 2004

The appellant states that on June 14, 2004, he received a phone call from RO official Cynthia Canady, who told him that (1) the RO had made a decision on his request to revise the July 1988 RO

---

[3] Our concurring colleague briefly questions whether the VA determination that RP is a congenital condition, and thus not compensable via in-service incurrence, may stand against the congressionally mandated presumption of soundness. We do not address this question as it was not raised by the parties and is not necessary to our decision.

decision based on CUE; (2) CUE was found in the July 1988 RO decision; (3) he would receive a July 1988 effective date with a "one time car allowance"; and (4) he would receive "a letter in about a week to ten days stating this award."[4]  R. at 320.  A week later, on June 21, 2004, Ms. Canady e-mailed the appellant's representative and advised him that "VA has made a decision on Mr. Sellers['s] claim."  R. at 540.  She asked for an address to which to send "a copy of the rating decision and notification letter."  *Id.*

That same day, according to a VA report of contact prepared by Ms. Canady, she spoke with the appellant's wife to "verify dependent information in [the] claim folders."  R. at 390.  On June 23, 2004, the appellant's representative responded to Ms. Canady's June 21, 2004, e-mail and provided a Denver, Colorado, street address for the Blinded Veterans Association.  R. at 540.

About a week later, the appellant phoned Ms. Canady to ask why he hadn't yet received his notification letter.  R. at 320.  She responded that it might take a month to receive the letter, but that she had completed the payment tabulation.  *Id.*  She quoted the appellant a total award figure of $495,963.03, but she stated that the figure could change because it needed to be reviewed by two other officials.  *Id.*

In late July 2004, the appellant called Ms. Canady again to check on the status of the notification letter, but she said that she could not explain why it had been delayed since her tabulations had been "corrected and verified."  *Id.*  Ms. Canady advised that his total award would be $534,233.33 plus an $11,000 one-time car allowance.  *Id.*

During the second week of September 2004, the appellant again called Ms. Canady to inquire into the status of the notification letter.  *Id.*  Upon investigation, Ms. Canady found that the file had been with "the rating board" since August 23, 2004, despite the fact that it bore two of the three signatures needed for disbursement.  *Id.*  Ms. Canady said that she could not explain why transmission had been delayed and that she could not help the appellant any further.  *Id.*

After again inquiring about the status of the letter that same week, the appellant was directed

---

[4]  This account comes from a January 11, 2005, letter submitted to VA on behalf of the appellant by U.S. Senator John Cornyn's office (January 2005 Cornyn Inquiry Letter), which contains the appellant's typewritten account of his interactions with the Houston RO from June 14, 2004, through December 2004.  R. at 319-21.

to the Visual Impairment Services Team (VIST) coordinator at the Houston RO. R. at 320-21. The appellant phoned the VIST coordinator who advised that an issue had arisen regarding the appellant's effective date and that he would look into it. R. at 321. There is no evidence that any followup was conducted.

C. The Houston RO's Claim Processing: October 2004 to February 2005

On October 28, 2004, RO Decision Review Officer (DRO) Beverly Cole sought advice from the VA regional counsel, based in New Orleans, Louisiana, regarding the July 1988 RO decision. R. at 294-95. In particular, Ms. Cole sought guidance on whether a March 1985 unpublished General Counsel (GC) opinion was binding and whether it would require the July 1988 RO decision to be revised based on a finding of CUE. R. at 294.

A regional counsel staff attorney responded to Ms. Cole's request on December 7, 2004, prefacing her response with the statement that she could not opine on whether the GC opinion would determine whether the July 1988 RO opinion contained CUE, but explaining that she could "advise on portions" of the request. R. at 295. The staff attorney also noted that the "claims folder contains a rating decision dated June 1, 2004." R. at 296. The staff attorney did not, however, comment on the significance of the June 2004 RO decision's presence in the claims file.

On November 14, 2004, the appellant submitted a letter to the RO in which he stated:

Please allow me to explain some concerns I have about my claim. Having my initial claim and its appeal denied in 1988 and now having been told my recent appeal was approved, you can imagine the excitement my family and I have felt . . . . I must admit my excitement is waning as the months pass by and my phone calls to [the Houston RO VIST coordinator] haven't been returned.

\*   \*   \*   \*

I have been informed that my claim is with the Rating Board. I also understand it's with the Decision Review Offices. What I don't understand is why my claim received two of the three necessary signatures and yet it is back to more review . . . . Why the long delay?

\*   \*   \*   \*

I want you to please write me a letter detailing where my claim actually is and how much longer I should expect [to wait] before my claim is finalized.

R. at 386. There is no record evidence showing that any RO official responded to the appellant's letter. During the first week of December 2004, the appellant again contacted the RO and, several

5

days later, an RO official advised the appellant that his file had been sent to New Orleans for a legal opinion. R. at 321. The official explained that there was a legal question whether the effective date would be 1988 or 1989, and that legal counsel recommended "us[ing] the earlier date," but that VA nevertheless owed the appellant money and that they would pay him. *Id*. In the second week of December 2004, the appellant visited the RO in person and was advised that the effective date for his evaluation would be February 5, 2004, the date of his CUE request to revise the July 1988 RO decision. *Id*.

On December 14, 2004, an RO rating specialist solicited an eye examination from the VA medical center as to the "[e]tiology/onset" of the appellant's RP. R. at 293, 377-79. At the January 14, 2005, examination, the examiner concluded that the appellant suffered from advanced RP "with very significant loss of peripheral vision [in] both eyes and small islands of vision remaining [in] both eyes." R. at 325. The physician concluded that it was

> at least as likely as not that the retinitis pigmentosa began to manifest while the patient was in military service. This is based not only on his own anecdotal experiences of reduced peripheral and night vision while actively engaged in his military duties but also based on viewing records of eye exams when he was separated from military service in September of 1973 during which time he made similar complaints . . . . As for whether the retinitis pigmentosa was aggravated by the patient[']s military service, I cannot resolve that issue without resort to mere speculation.

*Id*.

On January 31, 2005, the RO issued a decision granting service connection for RP effective February 5, 2004, but denying the appellant's request to find that the July 1988 RO decision contained CUE. R. at 352-71. The decision also awarded the appellant entitlement to special monthly compensation, adapted housing, and automobile and adaptive equipment. R. at 366, 371. The January 2005 RO decision was signed by two officials: (1) Susan Durkin, and (2) Beverly Cole, the DRO who had sought an opinion from the VA regional counsel in October 2004. R. at 294, 371.

### D. The Appellant's Notice of Disagreement and Subsequent RO Actions

On March 11, 2005, the appellant, through his representative, filed his NOD with the January 2005 RO decision. R. at 332. On May 3, 2005, the appellant filed a statement setting forth more fully the reasons he disagreed with the RO's denial of his request to revise the July 1988 RO decision

based on CUE.[5] R. at 286. In particular, the appellant stated:

> I am [] submitting a copy of [an] undated VARO letter with rating decision dated June 1, 2004, as evidence that my effective date should be March 25, 1988, as this previous decision established. I contend this effective date is based on a Clear and Unmistakable Error (CUE) . . . .

*Id*. The June 2004 RO decision that the appellant attached to his correspondence found CUE in the July 1988 RO decision and granted entitlement to service connection for RP at a 100% evaluation, effective March 25, 1988. R. at 289, 292. The June 2004 RO decision set forth the reasons for the decision and a summary of the evidence. R. at 290-91. The June 2004 RO decision also granted special monthly compensation and entitlement to automobile and adaptive equipment. R. at 292-93. That decision contained the signatures of three officials: (1) Susan Durkin, who also signed the January 2005 decision; (2) "L. Spurlock"; and (3) the illegible signature of an official purporting to sign "for" Paul Black, Chief of the Houston RO.[6] R. at 293.

The cover letter that the appellant submitted with the June 2004 RO decision was addressed to the appellant's representative in Denver, Colorado. R. at 287. The letter is undated, but contains the stamped signature of Houston RO Chief Paul Black. R. at 287-88. Unlike the June 2004 RO decision, the cover letter refers only to the appellant's entitlement to automobile and adaptive equipment.[7] R. at 287-88.

However, the letter's "Enclosure(s)" line contains three entries: (1) "VA Form 4107"; (2) "VA Form 21-4502;" *and* (3) "*Rating Decision*." R. at 288 (emphasis added). The letter further explains "[t]he enclosed *VA Form 4107, 'Your Rights to Appeal Our Decision*,' explains your right to appeal." *Id*. The letter also notes that VA Form 21-4502 is the "Application for Automobile or Other Conveyance and Adaptive Equipment." R. at 287. The record is not clear as to when or how the appellant obtained the notification letter or the June 2004 RO decision.

---

[5] The May 2005 statement was received by the RO on June 6, 2005. R. at 286.

[6] In its June 29, 2011, supplemental decision, the Board found that the third signer was a "coach," who "sign[ed] on behalf of the Chief, Veteran's Service Center." *See Ivan Sellers*, BVA 08-1758, at 5.

[7] The record does not contain any rating decision decided prior to the June 2004 RO decision that granted entitlement to automobile and adaptive equipment.

On August 22, 2005, the RO issued an SOC in response to the appellant's March 2005 NOD, reiterating its January 2005 finding that the July 1988 RO decision did not contain CUE. R. at 200-25, 249-76. The August 2005 SOC neither mentioned nor acknowledged receipt of the appellant's May 2005 statement discussing the attached June 2004 RO decision.

On October 14, 2005, the appellant, through his representative, submitted his Substantive Appeal to the Board. R. at 177-88. This document appealed the August 2005 SOC. The Substantive Appeal does not mention the May 2005 statement or the June 2004 RO decision. In response to the appellant's Substantive Appeal, the RO issued a Supplemental Statement of the Case (SSOC) on April 10, 2006. R. at 173-76. The April 2006 SSOC does not mention the May 2005 statement or the June 2004 RO decision. R. at 173.

On June 22, 2006, the appellant requested a hearing in connection with his "pending appeal for effective date and Clear and Unmistakable Error (CUE) for retinitis pigmentosa." R. at 154. At the December 18, 2006, hearing held at the RO by DRO Marian Peters, the appellant testified that he had received a call on June 14, 2004, advising him that his request to revise the July 1988 RO decision based on CUE had been granted and that he would receive a check "for the retroactive payback of [sic] March 1988." R. at 81. The appellant explained that subsequent attempts to obtain the retroactive payment based upon the June 2004 RO decision were unfruitful. R. at 81-82. In response, DRO Peters stated that

> we've had the person in our front office [] look at this case; like you were saying you were called [and told] that it had been approved; that is true. *We tried to grant the benefit from our perspective, but the front office said No! This is an incorrect decision. As a DRO I cannot overrule what the front office says*; however, I am going to wait until I get your transcript back with everything that you have said in this hearing today. When I get that transcript back, I'm going to go and see if I can talk to some people that are in the front office to see if they will listen and see . . . if they will listen and read what you have told me concerning the law that we should apply . . . but I as a Decision Review Officer cannot overrule what the front office says because a decision review officer prior to me was the one that signed off on the rating granting, saying it was a clear and unmistakable error . . . . I cannot promise you anything.

R. at 83 (emphasis added).

On June 21, 2007, the RO issued a second SSOC, signed by DRO Dexter Leavitt, in which it reaffirmed its January 2005 finding that the July 1988 RO decision did not contain CUE. R. at 66-

72. The appellant appealed this RO decision. R. at 57.

### E. Proceedings Before the Board

On December 17, 2007, the Board conducted a hearing at which the appellant testified as to his failed attempts to obtain the disability compensation award dictated by the June 2004 RO decision. R. at 29-30. With respect to the June 2004 RO decision, the appellant stated: "I have a copy of it, I have the signed signatures and when I showed it to someone [] in the regional office they were surprised that I had signatures because I'm not supposed to have . . . [the] decision . . . ." R. at 29. The appellant continued that he "was never told why [the June 2004 RO decision] was not allowed," and that was why he had a "bad taste in [his] mouth." R. at 29-30.

On April 2, 2008, the Board issued a decision denying the appellant's motion to revise the July 1988 RO decision based on CUE, but failed to acknowledge or discuss the June 2004 RO decision. R. at 2-18. Instead, the decision focused on the merits of the appellant's motion for revision based on CUE and earlier-effective-date argument. R. at 4-16.

### F. Procedural History on Appeal: The June 2004 RO Decision Revelation

On June 9, 2008, the appellant filed his Notice of Appeal to this Court. The appellant's initial and reply briefs, prepared by his attorney at the time, failed to mention the June 2004 RO decision. The record did not include the June 2004 RO decision or any related documents, and it lacked several documents critical to the appeal, including the August 2005 SOC and the complete January 2005 RO decision.

On January 25, 2011, the Court issued a memorandum decision affirming the Board's April 2, 2008, decision that the July 1988 RO decision did not contain CUE. *See Sellers v. Shinseki*, No. 08-1758, 2011 WL 219905 (Jan. 25, 2011). On February 10, 2011, the appellant's counsel moved to withdraw citing the appellant's instruction, and the Court granted his motion 15 days later. The next day, the appellant filed a motion for panel review pro se, attaching the June 2004 RO decision as evidence that he was entitled to a March 1988 effective date pursuant to *MacKlem v. Shinseki*, 24 Vet.App. 63 (2010). *See* Motion for Panel Review at 3-5, 8-12.

On May 27, 2011, the Court granted the appellant's motion for panel review, withdrew the January 25, 2011, memorandum decision, and remanded the matter to the Board for the limited purpose of determining (1) whether the June 2004 RO decision was an authentic document; and (2)

whether it was the subject of the Extraordinary Award Procedure (EAP), invalidated by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) in *Military Order of the Purple Heart v. Secretary of Veterans Affairs*, 580 F.3d 1293 (Fed. Cir. 2009) (*Purple Heart)*.

On remand, the same Board member who presided over the appellant's December 2007 Board hearing and who produced the April 2008 Board decision began by making the following observations:

> [T]he Board notes that the June 2004 document was not of record at the time of the Board's April 2008 decision. This document was first submitted by the Veteran in June 2005. This document appears to be a document created by the RO, and shows that it was signed by three RO personnel (a rating specialist, a decision review officer, and a "coach" (signing on behalf of the Chief, Veteran's Service Center)), who determined that the July 1988 decision, which denied service connection for retinitis pigmentosa, was CUE.

*Ivan Sellers*, BVA 08-1758, at 5. The Board ultimately concluded that the June 2004 RO decision was authentic. *Id.* at 6.

The Board next found that the June 2004 RO decision was not promulgated pursuant to the EAP. *Id.* at 9. The Board first explained that the EAP at issue in *MacKlem* and *Purple Heart* was not in effect at the time the June 2004 RO decision was revised. *Id.* at 10. The Board also found that nothing indicated that the June 2004 RO decision was subject to an "EAP-like" process. *Id.* The Board further observed that there was no basis to show that the RO sought and obtained a determination from the Compensation and Pension Service or other decisionmaker outside the RO. *Id.* at 11. On the contrary, according to the Board:

> The evidence shows that the Veteran's claim was adjudicated only by RO personnel, specifically, the January 2005 grant of his claim was signed by two RO personnel. He is therefore not shown to have been denied "in person" interaction with the deciding officials, as required by 38 C.F.R. § 3.103(c)(2).

*Id*.

The Board also found that the June 2004 RO decision was not received "in the regular course of business" by the appellant:

> This document does not bear a date stamp, or any other indication, to show that it was ever mailed to the Veteran, nor does the Veteran contend[] that he received this document in the regular course of business as a decisional document. *See* 38 U.S.C.A. § 5104. This document is not accompanied by a cover letter, nor does it

10

contain any indication that it notified the Veteran of his appellate rights. *See* 38 C.F.R. § 19.25 (2010). In short, there is nothing to show that this document was provided to the appellant in the regular course of business as a decisional document. In this regard, the Veteran has stated that he was advised that his claim had been granted during telephone conversations with RO personnel in June 2004. *See* Veteran's letters, received in January 2005 and August 2010. In his January 2005 letter to his Congressman, he clearly expressed frustration that an award letter had not been received. The fact that VA did not transmit the June 2004 provisional document to the Veteran in the normal course of business is a clear indication that VA did not intend the June 2004 document to be a final decision.

*Id.* at 10.

The Board ultimately concluded that the June 2004 RO decision "was apparently written up as a . . . *draft* decisional document," and was subject to further review, including review informed by advisory legal and medical opinions. *Id.* at 11 (emphasis in original). The Board also noted that receipt of incorrect information from RO personnel alone is not a basis upon which to award benefits. *Id.* at 12.

G. Procedural History on Appeal: Supplemental Briefing on the June 2004 RO Decision

In September 2011, the Court required the parties to submit supplemental briefing on two jurisdictional questions raised by the supplemental Board decision. First, the parties were required to articulate what transmission from VA to a claimant is considered a "decision" that binds VA field offices and to discuss whether the June 2004 RO decision constitutes such a decision. September 2011 Briefing Order at 1. Second, the parties were ordered to address whether the presumption of regularity attached to the manner in which the June 2004 RO decision was approved and transmitted to the appellant. *Id*. The parties were also ordered to be prepared to discuss at oral argument whether an August 2011 revision to 38 C.F.R. § 3.103(c)(1) (2010) would have an impermissible retroactive effect as applied in this case. *Id*. at 2.

## II. ANALYSIS

### A. A Binding RO Decision as Jurisdictional Prerequisite

#### 1. Introduction

This Court's ability to hear and decide cases is predicated upon the parties' timely adherence to procedural requirements imposed by statute and regulation. *See Best v. Brown,* 10 Vet.App. 322,

11

325 (1997); *see also Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1201-06 (2011). The requirement that the Court may only review Board decisions over which the Board had jurisdiction, is the touchstone of the Court's own jurisdiction. *See* 38 U.S.C. §§ 7104(a) (jurisdiction of the Board), 7252(a) (jurisdiction of the Court), 7266(a) (Notice of Appeal); *see also Jarrell v. Nicholson*, 20 Vet.App. 326, 334 (2006) (en banc). In this vein, the Board is unable to act on a "matter" absent an appealable, binding RO decision that is adverse to the claimant. 38 U.S.C. §§ 511(a) (decisions of the Secretary), 7104(a); *see also Godfrey v. Brown*, 7 Vet.App. 398, 409-10 (1995); *Bernard v. Brown*, 4 Vet.App. 384, 391 (1993).

For an RO decision to be effective, the RO must provide notice in accordance with section 5104(a). *See* 38 C.F.R. § 3.104(a) (2011) ("A decision of a duly constituted rating agency . . . shall be final and binding on all field offices of the Department of Veterans Affairs as to conclusions based on the evidence on file *at the time VA issues written notification in accordance with 38 U.S.C. [§] 5104*." (emphasis added)). Such notice must, among other things,[8] be "provide[d]" to the claimant and the claimant's representative and include "an explanation of the procedure for obtaining review of the decision." 38 U.S.C. § 5104(a).

Once notice has been issued pursuant to section 5104(a), the RO may not effect any revisions to its decision, sua sponte, on the same factual basis,[9] without a finding of CUE. 38 U.S.C. § 5109A(a); 38 C.F.R. §§ 3.104(a), 3.105(a) (revision of decisions) (2011). Binding the RO at the time section 5104(a) notice is issued serves to "preclude repetitive and belated readjudication of veterans' benefit[s] claims." *Cook v. Principi*, 318 F.3d 1334, 1339 (Fed. Cir. 2002). Binding the RO at such time also activates a claimant's ability to accept its decision or appeal the decision to the Board. 38 U.S.C. § 7105(a)-(c).

Exercise of this Court's jurisdiction is thus dictated by the RO issuing a binding decision, in accordance with section 5104(a), which a claimant may appeal. *See* 38 U.S.C. §§ 7104(a), (b), (c),

---

[8] See section II.A.3, *infra*, for a full discussion of these requirements.

[9] Revisions to final decisions made on *different* facts must be made pursuant to a finding of new and material evidence, and because the adjudication is based on a new set of facts it is, in effect, an adjudication of a new claim. 38 U.S.C. § 5108. There is no dispute that no such finding was made at any point in this case.

7252(a), 7266(a). Any question, therefore, whether the Board improperly acted upon a nonbinding, unappealable RO decision invokes the Court's independent obligation to police its own jurisdiction:

> [J]urisdiction[al] [questions] alter[] the normal operation of our adversarial system. Under that system, Courts are generally limited to addressing the claims and arguments advanced by the parties. Courts do not usually raise claims or arguments on their own. But federal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press.

*Henderson*, 131 S. Ct. at 1202 (citation omitted); *see also Barnett v. Brown*, 83 F.3d 1380, 1383 (Fed. Cir. 1996) (stating that it is a "well-established judicial doctrine that any statutory tribunal must ensure that it has jurisdiction over each case *before* adjudicating the merits, that a potential jurisdictional defect may be raised by the court or tribunal, *sua sponte* or by any party, at any stage in the proceedings, and, once apparent, must be adjudicated" (emphasis added)). The Court is therefore compelled to resolve all jurisdictional questions before proceeding to the merits of an appeal.

### 2. The Jurisdictional Issue Before the Court

This appeal began as a dispute over whether the Board erred in finding that there was no CUE in the July 1988 RO decision (a determination first made by the RO in a January 2005 decision), but the introduction of the June 2004 RO decision calls into question whether the January 2005 RO decision itself was improperly promulgated. If the June 2004 RO decision is the operative RO decision, then the Board lacked jurisdiction to entertain the appeal of the January 2005 RO decision, and, in turn, this Court lacks jurisdiction to review the merits of the April 2008 Board decision. *Cf. Jarrell*, 20 Vet.App. at 334; *see also Bernard*, 4 Vet.App. at 391.

There is no dispute that the January 2005 RO decision did not find, pursuant to § 3.105(a), that the June 2004 RO decision contained CUE. There is also no dispute that the June 2004 RO decision is authentic, *Ivan Sellers*, BVA 08-1758, at 6, and there is no allegation of fraud.

However, the Secretary argues that the June 2004 RO decision is merely provisional because it lacks indicia of a binding RO decision, including clear evidence that the RO provided the appellant notice of the decision in accordance with 38 U.S.C. § 5104(a). Secretary's Supplemental (Supp.) Brief (Br.) at 5-7. The appellant responds that the June 2004 RO decision is binding upon VA because the record evidence requires the Court to presume that the Houston RO transmitted the

13

decision to the appellant and his representative. Appellant's Supp. Br. at 7-8. The Secretary maintains, however, that, irrespective of how the appellant received the June 2004 RO decision, an additional layer of review and authorization was required before it could be released so as to bind VA. Secretary's Supp. Br. at 10-11.

The Court must determine whether the RO provided section 5104(a) notice of the June 2004 RO decision to the appellant and his representative such that it became a final, binding decision pursuant to § 3.104(a). The Court will also examine whether the June 2004 RO decision was promulgated and authorized consistent with RO procedure set forth in *VA Adjudication Procedures Manual M21-1* (M21-1) and whether the June 2004 RO decision retains features of a typical RO decision.[10] In so doing, the Court is empowered to make any finding of fact "crucial to the proper determination of whether this Court has jurisdiction." *Stokes v. Derwinski*, 1 Vet.App. 201, 203-04 (1991); *see also Evans v. Shinseki*, 25 Vet.App. 7, 10 (2011).

### 3. The Provision of Notice

On remand, the Board found that, although the June 2004 RO decision was authentic, it was a "draft" decision. *Ivan Sellers*, BVA 08-1758, at 6, 11. First, the Board explained that the June 2004 RO decision was not accompanied by a cover letter or notice of appellate rights. *Id.* at 10. The Board further observed that "VA did not transmit the June 2004 provisional document to the Veteran in the normal course of business" and this fact "is a clear indication that VA did not intend the June 2004 document to be a final decision." *Id.* The Secretary echoes the Board's conclusion, emphasizing that, "[t]o the extent [the] [a]ppellant came into possession of [the June 2004 RO decision and notification letter] by means other than *direct receipt* from VA, they would not be in conformance with the requirements of [section 5104(a)]." Secretary's Supp. Br. at 5-6 (emphasis added).

The Board and the Secretary misunderstand the facts of this case and the minimum

---

[10] For purposes of this matter, it is unnecessary to determine whether M21-1 provisions serve as nonbinding guidance for VA adjudicators, *see Guerra v. Shinseki*, 642 F.3d 1046, 1050-51 (Fed. Cir. 2011), or whether they have the force and effect of law. *See Cohen v. Brown*, 10 Vet.App. 128, 139 (1997); *Fugere v. Derwinski*, 1 Vet.App. 103, 107 (1990); *see also Morton v. Ruiz*, 415 U.S. 199, 235 (1974); 38 C.F.R. § 19.5 (2011). Therefore, the Court will not reach this issue.

14

requirements for the content and effective transmission of decisional notice. First, the notice requirements codified in section 5104(a) and enumerated in 38 C.F.R. § 3.103(b)(1), (f) dictate that notice of an RO decision shall be "provide[d] to the claimant and to the claimant's representative" and such notification shall be "in writing." Section 3.103(f) elaborates that

> [a]ll notifications will advise the claimant of the reason for the decision; the date the decision will be effective; the right to a hearing subject to paragraph (c) of this section; the right to initiate an appeal by filing a Notice of Disagreement which will entitle the individual to a Statement of the Case for assistance in perfecting an appeal; and the periods in which an appeal must be initiated and perfected (See part 20 of this chapter, on appeals).

38 C.F.R. § 3.103(f) (2011); *see also* 38 C.F.R. § 3.103(b)(1) (adding that notice shall include advice of the right to representation).

Second, the Board fails to appreciate that the June 2004 RO decision, as submitted with the appellant's May 2005 statement, was "[e]nclos[ed]" with a notification letter. R. at 287-92. The notification letter also provided that VA's "Form 4107" was enclosed with the letter, which indicates that the appellant received notice of his appellate rights as required by § 3.103(b)(1), (f).[11] R. at 288; *see, e.g., Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) (holding that the Court did not err "by applying the presumption of regularity to the mailing of a copy of a notice of appeal rights . . . particularly in light of the [notification letter] which was present in the record"). Thus, the Board's finding that there was "[no] indication" that the appellant was notified of his appellate rights was erroneous. *Ivan Sellers*, BVA 08-1758, at 10; *see Pentecost v. Principi*, 16 Vet.App. 124, 129 (2002) ("Reversal is the appropriate remedy when there is absolutely no plausible basis for the BVA's decision and where that decision is clearly erroneous in light of the uncontroverted evidence in appellant's favor" (citation omitted)).[12]

---

[11] The notification letter's effectiveness is not undermined because it only mentions the appellant's entitlement to automobile and adaptive equipment. *See* R. at 287-88. There is no RO practice to list all findings in a notification letter where, as here, the rating decision is provided with the notification letter. *See* R. at 288-93; M21-1, pt. III, ch. 11, para. 11.09(a)(1). There is also no evidence of an RO decision prior to June 2004 granting the appellant's entitlement to automobile and adaptive equipment.

[12] The appellant maintains that a written notice of appellate rights is unnecessary where, as here, a claimant receives a favorable decision. Appellant's Supp. Br. at 12. The inclusion of

In addition, our caselaw makes clear that defects of decisional notice are cured when the record demonstrates that the claimant and his representative *actually* received notice of the decision.[13] *See Clark v. Principi*, 15 Vet.App. 61, 62-64 (2001) (holding that Board's "mailing defect was cured by the appellant's actual receipt of a copy of the June 1999 Board decision in January 2000"); *cf. Hauck v. Brown*, 6 Vet.App. 518, 519 (1994) (stating that notice defects are not overcome where there is no evidence of actual receipt). Contrary to the Secretary's view, the issue whether VA directly transmitted decisional notice to the claimant is moot where actual receipt is established. *See Ashley v. Derwinski*, 2 Vet.App. 62, 65-67 (1992). Indeed, actual receipt serves to establish finality for purposes of appeal to this Court. *See id*. at 67 (holding that the date of actual receipt was the date on which the 120-day period of section 7266(a) began to run); *cf. Tablazon v. Brown*, 8 Vet.App. 359, 361 (1995) (holding that, "where VA has failed to procedurally comply with statutorily mandated requirements, a claim does not become final for purposes of appeal to the Court" and thus, "there is no final Board decision before us for review").

In *Ashley*, the Board mailed its decision to the claimant consistent with section 7104(e), but the Board failed to mail its decision to the appellant's representative. *Ashley*, 2 Vet.App. at 67. Rather, a third party – a "State Veterans Claims Agent" – relayed to the representative a copy of the decision previously mailed to the claimant. *Id*. at 65. The Court in *Ashley* held that the defective transmission of the Board decision to the representative via a third party was irrelevant because the record established that the representative in fact received the decision. *Id*. at 67 ("There is no need for us to decide what the result would have been had [the claimant's representative] never received the decision."). Similarly, where a claimant demonstrates actual receipt of an RO decision and notice from either the RO *or* his representative, there is no question whether such notice is effective and binding on VA pursuant to section 5104(a) and § 3.104(a).

---

VA's written notice of appellate rights form with the notification letter moots the appellant's argument; therefore, the Court need not resolve this issue.

[13] The Secretary argues that the notification letter bears inconsistencies with RO procedures for the dating and filing of final correspondence. Secretary's Supp. Br. at 5; *see also* M21-1, pt. III, ch. 11, para. 11.06. As explained above, however, these inconsistencies are irrelevant where it is established that the claimant and his representative have received notice.

In this case, the record at bar provides ample evidence that the appellant and his representative received the June 2004 RO decision and notification letter, as submitted with the appellant's May 2005 statement.[14] On June 14, 2004, an RO official advised the appellant that a decision had been rendered and that written notice was forthcoming. R. at 320. In an email to the appellant's representative on June 21, 2004, an RO official confirmed that a decision had been rendered and asked that the representative provide a mailing address to which to send a copy of the "rating decision and notification letter." R. at 540. In response, the representative provided the Denver, Colorado, street address for his service organization. *Id*. RO officials prepared a notification letter, secured the RO Chief's signature, and affixed the Denver, Colorado, street address to the notification letter. R. at 287-88. In his May 2005 statement to the RO, the appellant "[e]nclos[ed]" the June 2004 RO decision with the notification letter bearing the Denver, Colorado, street address provided by the representative. R. at 286-92. The appellant asserted that the June 2004 RO decision and accompanying notification letter demonstrated that the July 1988 RO decision was "based on a Clear and Unmistakable Error." R. at 286.

Thus, we need not decide how the appellant received the June 2004 RO decision directly from the RO or from his representative because the facts of this case establish that VA provided

---

[14] The Secretary also speculates that the appellant's representative obtained possession of these documents during a period of review sanctioned by M21-1, pt. VI, ch. 2, para. 2.05. Secretary's Supp. Br. at 6. However, the record provides no basis for this theory. As the Secretary posits, RO procedure permits a claimant's representative to review a rating decision and discuss any outstanding issues with a rating official at the RO or, with permission from the Chief of the RO, outside the RO. *See* M21-1, pt. VI, ch. 2, para. 2.05. The Secretary ignores, however, the RO's practice, consistent with regulation, of preparing notification letters only at the time of issuing binding decisions, not when providing for a representative's review of a draft rating decision. *See* M21-1, pt. III, ch. 11, para. 11.09(a); 38 C.F.R. §§ 3.103(b)(1), (f), 3.104(a); *cf.* M21-1, pt. VI, ch. 2, para. 2.05. Thus, the fact that the RO expressed its intent to send a notification letter to the appellant's representative 20 days *after* the rating decision was approved (R. at 289, 540), and that the notification letter is addressed to the representative (R. at 540), is clear evidence that he did not obtain the June 2004 RO decision during a period of prepromulgation review. Moreover, there is no record evidence suggesting that the appellant's representative traveled from his location in Denver, Colorado, to the RO in Houston, Texas, to conduct the in-person review contemplated by RO procedure or that the representative was granted an exemption from the Chief of the RO for offsite review. *See* M21-1, pt. VI, ch. 2, para. 2.05. The Secretary's speculation must, therefore, be rejected.

17

notice of the June 2004 RO decision in accordance with section 5104(a) and § 3.103(b)(1), (f). Accordingly, the Secretary's arguments must be rejected and the Board's findings on this issue must be reversed.

4. *The Adjudicative Process and Rating Decision Content*

The Secretary also argues that the June 2004 RO decision is not a final, binding decision because it was not promulgated consistent with RO decision-authorization procedure. The Secretary repeatedly refers to an additional layer of review, which should have occurred after the designee of the Chief of the RO signed the June 2004 RO decision, which was required to render the decision binding, rather than merely "provisional[]." Secretary's Supp. Br. at 10. Specifically, citing to M21-1 provisions, the Secretary maintains that a "post-determination team" was required to review the June 2004 RO decision and calculate an "award" (a schedule of payments) before it could be released to the appellant and bind VA. Secretary's Supp. Br. at 9. In other words, the Secretary asserts that the appellant and his representative could not be notified until after postdetermination review.

However, even assuming that the M21-1 provisions cited by the Secretary dictated the RO's conduct here, such provisions do not explicitly establish the sequence in which RO adjudicative tasks are performed, nor do they demonstrate that an "award" letter must be generated before a "rating decision" can be transmitted to a claimant and bind VA. Rather, the cited M21-1 provisions merely (1) describe the organization of RO adjudicative functions; (2) identify the procedures to approve "rating decisions" granting entitlement to large retroactive awards; (3) discuss the procedures to authorize "awards" generally; and (4) list requirements for notifying claimants of RO decisions, including those provided by § 3.103(b), (f).[15] These provisions fail to establish that rating decisions *must* be delayed at the behest of producing RO "award" letters.

By contrast, the record demonstrates that the decisional content stipulations set forth in M21-1, pt. VI, ch. 3, paras. 3.08-3.30 are met by the June 2004 RO decision, including the following: (1) The organization of the decision into "narrative" and "codesheet" sections; (2) inclusion of "Introduction," "Decision," "Evidence," "Reasons for Decision," and "References" subsections; and (3) specific evaluation and effective date. R. at 287-93. Moreover, consistent with M21-1, pt. VI,

_____

[15] *See* M21-1, pt. I, ch. 2, paras. 2.01-2.03; M21-1, pt. III, ch. 11, para. 11.09(a); M21-1, pt. V, ch. 9, para. 9.01; M21-1, pt. VI, ch. 3, para. 3.07.

18

ch. 3, para. 2.04(c), the June 2004 RO decision itself contains two signatures from rating specialists, and a third from the designee of the Chief of the Veterans Service Center, in accordance with M21-1, pt. VI, ch. 3, para. 3.07. R. at 293.

*5. The Binding June 2004 RO Decision and 38 C.F.R. § 3.105(a)*

As discussed above, the June 2004 RO decision is an authentic product of the RO adjudicative process, it contains content typical of RO rating decisions, and the RO provided notice of the June 2004 RO decision to the appellant and his representative consistent with section 5104(a) and § 3.103(b)(1), (f). In light of these facts, the Court must hold that VA is bound by the June 2004 RO decision. *See* 38 C.F.R. § 3.104(a).

It follows, therefore, that the January 2005 RO decision is void ab initio.[16] The January 2005 RO decision is not based on a finding of new and material evidence, *see* 38 U.S.C. § 5108, nor is it predicated on a finding of CUE in the June 2004 RO decision, s*ee* 38 C.F.R. § 3.105(a), nor did the RO follow the established procedures for revoking a prior decision. *See* 38 C.F.R. § 3.105(e). The RO thus lacked authority to render a decision on the same factual basis as the June 2004 RO decision, *see* 38 C.F.R. § 3.104(a), and the Board's exercise of jurisdiction over the January 2005 RO decision was likewise in excess of statutory authority. 38 U.S.C. §§ 7104(a), (b), (c); *see also Jarrell*, 20 Vet.App. at 334; *Bernard*, 4 Vet.App. at 391.

B. The Applicability of *Purple Heart*

*1. Introduction*

The peculiar facts of this case raise an issue that provides an alternative basis upon which to hold that the Board lacked jurisdiction to entertain the merits of the January 2005 RO decision: Namely, whether the process by which the RO revised its June 2004 RO decision violates the appellant's procedural rights, thus rendering the January 2005 RO decision void ab initio. *See MacKlem*, 24 Vet.App. at 71 (finding that where an RO decision was revised pursuant to the invalid EAP, the resulting decision was void ab initio); *Purple Heart*, 580 F.3d at 1297-98.

The principle announced in *Purple Heart* and enforced in *MacKlem* holds that policies that impinge upon the "veteran's right to participate and respond" while VA revises a decision on the

---

[16] The Secretary's attempt to apply the presumption of regularity to the January 2005 decision must, therefore, fail. Secretary's Supp. Br. at 8.

veteran's claims violate 38 C.F.R. § 3.103(c), among other regulations. *Purple Heart*, 580 F.3d at 1297. To be sure, as the Board determined, the EAP at issue in *Purple Heart* is not implicated in this case – the EAP was first instituted in August 2007, more than two years after review of the June 2004 RO decision. *Ivan Sellers*, BVA 08-1758, at 10. However, the question before the Court, as the Board recognized, is whether the RO engaged in an "EAP-like" procedure in its review of the June 2004 RO decision, which, too, would run afoul of the principle announced in *Purple Heart*. *Ivan Sellers*, BVA 08-1758, at 10. Such a question of law is one the Court reviews de novo, without deference to the Board's conclusions of law. *See Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc).

### 2. Law

At the time of the *Purple Heart* decision, a claimant's "right to participate and respond" was principally protected by provisions of § 3.103, which stated:

> § 3.103(a) Statement of policy. Every claimant has the right to written notice of the decision made on his or her claim, the right to a hearing, and the right to representation . . . and it is the obligation of the VA to assist a claimant in developing the facts pertinent to the claim . . . . The provisions of this section apply to all claims for benefits and relief, and decision thereon, within the purview of this part 3.
>
> \*   \*   \*   \*
>
> § 3.103(c)(1). Upon request, a claimant is entitled to a hearing at any time on any issue involved in a claim . . . . VA will provide one or more employees who have original determinative authority of such issues to conduct the hearing and be responsible for establishment and preservation of the hearing record.
>
> \*   \*   \*   \*
>
> § 3.103(c)(2). The purpose of a hearing is to permit the claimant to introduce into the record, in person, any available evidence which he or she considers material and any arguments or contentions with respect to the facts and applicable law which he or she may consider pertinent . . . . It is the responsibility of the employee or employees conducting the hearings to explain fully the issues and suggest the submission of evidence which the claimant may have overlooked and which would be of advantage to the claimant's position.

*Purple Heart*, 580 F.3d at 1296-97 (citing 38 C.F.R. § 3.103(a), (c)). The Federal Circuit in *Purple Heart* also cited § 3.105, under which, in the event of a proposed reduction in granted benefits, the RO must give the beneficiary "60 days for the presentation of additional evidence to show that [the] benefits should be continued at their present level." *Id*. (citing 38 C.F.R. § 3.105(e), (f), (g)). The Federal Circuit observed that these procedural protections were threatened by the EAP:

20

[B]y the new procedure the veteran does not have a hearing in the presence of the persons who now have final decisional authority for [RO] decisions. It is not disputed that there is no opportunity to provide additional evidence "which would be of advantage," § 3.103(c)(2), and that the veteran is not told when the [RO] makes an award that meets the criteria of this new C & P procedure. The [EAP] instructs the [RO]: "Do not offer these [large award] rating decisions to any veteran's representative for review until the C & P Service makes a final determination regarding the propriety of the decision."

The new procedure does not provide the "in person" interaction provided by § 3.103(c)(2), and no opportunity to respond to the concerns of the deciding official, whose decisional authority is removed from the [RO]. See Fast Letter 07-19, at 2 ("If the C & P determines the decision is improper, it will provide specific corrective action."); Fast Letter 08-24, at 3 ("C & P instructions are considered part of the pre-decisional process and are not to be included in the permanent record . . . . [R]epresentatives will be permitted the opportunity to review the draft rating decision, but only after the file is returned from C & P Service and corrections, if necessary, are made to it."). The C & P Service's determination is then issued in the name of the [RO], and the veteran has no way of knowing what persuaded an unidentified decision-maker to reduce the award that was made by the persons before whom the hearing was held.

*Purple Heart*, 580 F.3d at 1297. The Federal Circuit, accordingly, held the EAP invalid. *Id*. at 1297-98.

### 3. The Retroactive Effect of 38 C.F.R. § 3.103(c)(1) (2011)

Since *Purple Heart* and *MacKlem* were decided, § 3.103(c)(1) was amended. Effective August 23, 2011, § 3.103(c)(1) no longer guaranteed a hearing before "one or more employees who have original determinative authority" over the issues to be decided at the hearing. Instead, claimants were only entitled to a hearing before "one or more employees of the VA office having original jurisdiction over the claim to conduct the hearing and to be responsible for establishment and preservation of the hearing record." *Compare* 38 C.F.R. § 3.103(c)(1) (2011), *with* 38 C.F.R. § 3.103(c)(1) (2010).[17] The regulatory provision was amended while the appellant's claim was

---

[17] VA claimed that "[t]his language [was] consistent with other portions of § 3.103(c)(1)." Rules Governing Hearings Before the Agency of Original Jurisdiction, 76 Fed. Reg. 52,572-01, 52,573 (Aug. 23, 2011) (to be codified at 38 C.F.R. pts. 3, 20). VA undertook this amendment as part of a host of amendments to "reflect VA's intent" to "clearly distinguish hearings before [agencies of original jurisdiction] from hearings before the Board, including the duties of the respective VA personnel conducting the hearing." *Id*.

pending before this Court. *See* Rules Governing Hearings Before the Agency of Original Jurisdiction, 76 Fed. Reg. at 52,572-73.

At oral argument, the Secretary conceded that the amendment did not alter the RO's responsibilities with respect to the conduct of hearings. Given this concession, the Court need not inquire into whether VA's amendment "would impair rights a party possessed when he acted," thus having "an impermissible retroactive effect."[18] *Ervin v. Shinseki*, 24 Vet.App. 318, 322 (2011) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 272 (1994)).

### *4. The* Purple Heart *Doctrine Applied to this Case*

The Board found that the January 2005 RO decision was not produced pursuant to an EAP-like procedure. *Ivan Sellers*, BVA 08-1758, at 11. The Board explained that the RO did not abdicate decisionmaking authority to an outside decisionmaker and that the appellant's claim was adjudicated by RO personnel. *Id.* As such, the Board reasoned that the appellant was not denied "in[-] person interaction with the deciding officials, as required by 38 C.F.R. § 3.103(c)(2)." *Id.* At oral argument, the Secretary echoed the Board's position.

However, both the Board and the Secretary neglect key facts that demonstrate that the appellant's rights to participate and respond were violated here. As in *MacKlem*, 24 Vet.App. at 66, 71, the appellant was advised of a decision on his claim authorized by RO officials, but, unlike *MacKlem*, this case involves an RO that surreptitiously commenced review and revision of that decision despite the fact that it had issued final and binding decisional notice to the appellant and his representative pursuant to section 5104(a) and § 3.103(b)(1), (f). *Cf. id.* at 67, 71 (referring to decision as a "proposal"); *see also* R. at 320-21.

Furthermore, between June 2004 and December 2004, the appellant attempted at least seven times to learn of the status of his decision – including sending a letter to the Chief of the RO – but

---

[18] Effective June 18, 2012, VA's August 23, 2011, revision to § 3.103(c)(1) is rescinded. VA took this action because the prior amendment failed to adhere to notice-and-comment procedures required by the Administrative Procedure Act (APA). *See* Rules Governing Hearings Before the Agency of Original Jurisdiction and the Board of Veterans' Appeals; Repeal of Prior Rule Change, 77 Fed. Reg. 23,128-01 (Apr. 18, 2012) (codified at 38 C.F.R. pt. 3, 20).

was given neither an adequate explanation, nor an audience by a final decisionmaker. R. at 320-21, 386. Even more peculiarly, after the appellant formally requested a hearing in June 2006, DRO Marian Peters confessed that (1) the hearing would not be held by persons with final decisionmaking authority; (2) even though she did not initially approve the June 2004 RO decision (R. at 293), she worked to prevent revision of it; and (3) an unidentified entity known as "the front office" exercised final decisional authority and secured revision of the June 2004 RO decision without the appellant's knowledge or participation. R. at 82-83, 154.

Contrary to the Board and the Secretary's position, the fact that the revision of the June 2004 RO decision never left the RO is of no moment. The Federal Circuit in *Purple Heart* noted that the EAP removed decisional authority from the RO, but central to the court's ruling was the undisputed fact that the EAP prevented "a hearing in the presence of the persons who . . . have final decisional authority for [RO] decisions," refused an "opportunity to respond to the concerns of the deciding official," and resulted in a diminution of benefits that would have otherwise been conferred upon the veteran. 580 F.3d at 1297. That final decisional authority was removed from the RO was merely incidental to the dictates of the EAP, and its relevance to this matter is limited in light of the fact that the RO bound itself to the dictates of the June 2004 RO decision pursuant to § 3.104(a).[19]

The Court cannot tolerate a similarly opaque, obfuscatory revision process in this case merely because VA saw fit to confine its conduct to the agency of original jurisdiction. Indeed, the right to a hearing before persons with "original determinative authority" guaranteed in § 3.103(c)(1), a right on which the Federal Circuit in *Purple Heart* explicitly relied, 580 F.3d at 1296, is not limited to cases in which the decisionmaker operates outside the RO. To read § 3.103(c)(1) as the Board and Secretary insist would invite subversion.

As the Court in *MacKlem* observed, 24 Vet.App. at 72, VA is encouraged to implement efficiency and efficacy measures in the adjudication process, such as supervisory review of front-line adjudicators. The Court's holding today is no impediment to such innovations. Indeed, the record

---

[19] The EAP was challenged pursuant to 38 U.S.C. § 502, which provides for direct review of actions of the Secretary. *Purple Heart*, 580 F.3d at 1294 n.1 ("An action of the Secretary to which section 552(a)(1) or 553 of title 5 (or both) refers is subject to judicial review. Such review shall be in accordance with chapter 7 of title 5 and may be sought only in the United States Court of Appeals for the Federal Circuit.").

demonstrates that the June 2004 RO decision was authorized by rating specialist "Durkin," DRO "Spurlock," and, consistent with the review procedures for rating decisions granting entitlement to large retroactive awards, a designee of the Chief of the RO. R. at 293; *see also* M21-1, pt. VI, ch. 3, para. 3.07. If further review was required, the RO was empowered to undertake such review pursuant to § 3.105(a), but it was not permitted to introduce "a secret adjudication [in]to a non-adversarial system." *MacKlem*, 24 Vet.App. at 72.

This case presents a disturbing encroachment upon the appellant's rights to participate and respond codified at 38 C.F.R. § 3.103(c)(1) and vindicated in *Purple Heart*. Accordingly, consistent with *MacKlem*, 24 Vet.App. at 71-72, the January 2005 RO decision is void ab initio and the April 2008 Board decision relying on the January 2005 RO decision must be set aside as "not in accordance with law." *Id*. (citing *Brown v. Brown*, 5 Vet.App. 413, 422 (1993)); *cf. Schafrath v. Derwinski*, 1 Vet.App. 589, 595-96 (1991) (An "*ultra vires* action of [the Board] Chairman 'must be treated as though it had never been taken.'" (emphasis in original) (citing *In Re Fee Agreement of Smith*, 1 Vet.App. 492, 496 (1991) (per curiam))). On remand, the appellant must therefore be placed in receipt of the favorable and effective June 2004 RO decision. *See MacKlem*, 24 Vet.App. at 71 ("[T]he proper remedy is to place the appellant in the position he was in before the EAP, in receipt of a favorable decision, even if that position is erroneous."). The Board must proceed expeditiously, in accordance with 38 U.S.C. § 7112 (requiring Secretary to provide for "expeditious treatment" of claims remanded by the Court).

### III. CONCLUSION

After consideration of the appellant's and the Secretary's pleadings, and a review of the record, the Court holds that (1) the June 2004 RO decision is binding upon VA; and (2) the April 2, 2008, Board decision is set aside. The Court also reverses the findings of the Board's June 29, 2011, supplemental decision relating to the draft status of the June 2004 RO decision and whether that decision was accompanied by a notice of appellate rights. Accordingly, the Board's April 2, 2008, decision is SET ASIDE and the Board's June 29, 2011, supplemental decision is REVERSED IN PART and AFFIRMED IN PART, and the matter is REMANDED for action consistent with this opinion.

KASOLD, *Chief Judge*, concurring in the result:  I agree with my colleagues that Mr. Sellers is entitled to an effective date for benefits for his RP disease earlier than February 5, 2004, albeit for different reasons.

Specifically, I cannot agree with the majority's holding that the Board clearly erred in its supplemental 2011 finding[20] that the June 2004 RO decision was not binding because it was not issued to Mr. Sellers in the normal course of business.  The majority hold that, because Mr. Sellers and his representative actually received the June 2004 RO decision and a notification letter, that decision was binding regardless of how he received it.  But, the "notification letter" cited by the majority is not addressed to Mr. Sellers, is undated, purportedly awards Mr. Sellers financial assistance in purchasing an automobile, and does not mention an award of benefits based on CUE.  Moreover, the claims file only contains the copy sent by Mr. Sellers.  There is no indication that this notification was ever issued by the Secretary or that it related to the June 2004 RO decision denying CUE.

Succinctly stated, the Board's finding that the June 2004 RO decision was not final because it was not issued in the normal course of business is plausible based on the record of proceedings and I do not have a "firm conviction" that the Board erred in that finding.  *See* 38 U.S.C. § 7261(a)(4); *Gilbert v. Derwinski*, 1 Vet.App. 49, 52 (1990) ("'A finding is "clearly erroneous" when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948))).

I also disagree with the majority's views that only actual receipt – no matter how transmitted or obtained – matters in determining whether a decision has been issued and is binding.  Not only does this view open a pandora's box of mistakenly released or fraudulently acquired drafts, especially under the Secretary's current provision that representatives may review decisions before their release, *see* M21-1, pt. VI, ch. 2, para. 2.05, but the cases cited in support of the majority's view are inapposite.  More specifically, *Ashley* and *Clark* found defects in transmission irrelevant *to veterans' assertions that their Notices of Appeal were untimely*; they do not find that a decision never transmitted in the normal course of business is binding.  *See Ashley v. Derwinski*, 2 Vet.App. 62, 65

---

[20]  The Board's 2011 supplemental decision was rendered at the request of the Court and focuses on the processing of Mr. Sellers's request for revision.

(1992) (claimant arguing that "the 120-day filing period . . . did not begin to run . . . , because the B[oard] failed to meet its statutory obligation to mail a copy of the decision to her representative"); *see also Clark v. Principi*, 15 Vet.App. 61, 63 (2001) (claimant arguing that his Notice of Appeal was timely because the Board decision was sent to the wrong address).

Accordingly, I would affirm the 2011 supplemental finding of the Board that the 2004 RO decision was not issued in the normal course of business and therefore is not binding on the Secretary.

On the other hand, because the facts found by the Board do not support its 2008 decision that the 1988 RO decision did not contain CUE, I would reverse the 2008 Board decision. Specifically, the Board found that Mr. Sellers entered service with no indication that he had RP. Although Mr. Sellers's separation examination also did not reflect that he had RP, the Board noted that he was referred for an optometry consultation examination because of complaints of decreased vision. As the Board found, that in-service eye examination report reflects that (1) Mr. Sellers complained of flashing lights and constricted field of vision, (2) Mr. Sellers had retinal pigment epithelial (RPE) defects, and (3) no pathology was found.[21] The 2008 Board also noted that a 1982 medical report diagnosed Mr. Sellers with RP and explained that RP is characterized by, inter alia, peripheral visual loss and changes in the back wall of the eye. Despite recognizing this record evidence, the Board inexplicably and summarily concluded that the evidence at the time of the 1988 RO decision reflected no competent evidence that RP manifested during service.

The Board further found no evidence of a specific, in-service diagnosis of RP, but it failed to recognize that there is no requirement that a veteran be diagnosed in service for a disease to be service connected. Indeed, the Board's focus on the timing of the diagnosis – rather than the manifestation of the symptoms – contravenes precedent. *See DeLisio v. Shinseki*, 25 Vet.App. 45, 56 (2011) ("[E]ntitlement to benefits for a disability or disease does not arise with a medical diagnosis of the condition, but with the manifestation of the condition . . . .").

---

[21] As the majority note, RPE defects are defects of "a layer of pigmented epithelium that is the outer of the two parts of the optic part of the retina . . . extending from the entrance of the optic nerve to the pupillary margin of the iris," and RP is "a group of diseases, frequently hereditary, marked by progressive loss of retinal response . . . , retinal atrophy, attenuation of the retinal vessels, and clumping of the pigment, with contraction of the field of vision." DORLAND'S at 1781, 1634.

Moreover, the record reflects that the 1988 RO did not deny benefits because Mr. Sellers did not have RP. Rather, the RO denied benefits because Mr. Sellers's RP was considered a constitutional or developmental abnormality (CDA) that was inherited and not aggravated in service. *See* R. at 452 (1988 RO decision stating: "Vet's [RP] is a CDA, not aggravated in service."). This view – that Mr. Sellers's RP was a CDA – was consistent with the Secretary's view at the time that RP was presumed to be hereditary if there was no evidence otherwise. *See* R. at 107 (VA Office of General Counsel Opinion 1-85 (Mar. 5, 1985) (reissued as VA Gen. Coun. Prec. 82-90 (July 18, 1990)), stating that "VA adjudicators ordinarily are justified in finding that [a congenital, developmental or familial in origin] disease, by its very nature, preexisted the claimant's military service"), 122 (VA Gen. Coun. Prec. 11-1999 (Sept. 2, 1999), noting that the M21-1, ch. 50, para. 50.09(d) (Jan. 3, 1986), instructed that "[i]f no other cause is shown for [RP], consider it to be hereditary, and determine service connection on whether or not there has been aggravation of this preexisting condition during service."); *cf.* 38 U.S.C. § 7104(c) (Board is bound by General Counsel opinions).

However, although the Secretary's presumption that RP is hereditary might be appropriate for many purposes, it cannot be used to defeat the congressionally mandated presumption of soundness. *See* 38 U.S.C. § 1111. Otherwise stated, because Mr. Sellers entered service without any notation that he had RP, his in-service manifestation of RP is presumed service connected unless it is shown by clear and unmistakable evidence that RP existed prior to service and was not aggravated by service. *Id.* Here, the Board found no evidence, and the record of proceedings reflects no clear and unmistakable evidence, that RP manifested prior to service, and the only medical evidence before the 1988 RO on whether Mr. Sellers had a family history of RP found "no specific evidence of similar problems in other members of your family." R. at 500 (1982 medical report).

In sum, Mr. Sellers would have been awarded service connection in 1988 but for the RO's presumption that RP was hereditary. Accordingly, I find the Board's 2008 determination that the 1988 RO decision did not contain CUE to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and I would reverse it – which is the basis for my concurring in the result of the majority's decision. *See Joyce v. Nicholson*, 19 Vet.App. 36, 42-43 (2005) (Board decisions on CUE motions are reviewed under the "arbitrary, capricious, an abuse of discretion, or

27

otherwise not in accordance with law" standard); *Fugo v. Brown*, 6 Vet.App. 40, 43-44 (1993) (demonstrating CUE requires showing that the outcome would have been manifestly different but for the error); *see also Gutierrez v. Principi*, 19 Vet.App. 1, 10 (2004) ("[R]eversal is the appropriate remedy when the only permissible view of the evidence is contrary to the Board's decision.").[22]

---

[22] One differentiating effect of a Board reversal and remand based on CUE in the 1988 RO decision as opposed to a Board reversal and reinstatement of the 2004 RO decision is that reversal by the Court predicated on CUE in an earlier decision does not permit further revision of that earlier decision by the Secretary. *Compare Winsett v. Principi*, 341 F.3d 1329, 1331 (Fed.Cir.2003) (holding that CUE may not be brought after an underlying issue has been adjudicated by a court and noting that permitting such action "would allow a lower tribunal to review the decision of a higher tribunal") *with* 38 C.F.R. §§ 3.104(a), 3.105(a) (permitting revision of final RO decisions based on CUE).