# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 17-1117

Douglas J. Rosinski, Petitioner,

v.

David J. Shulkin, M.D.,
Secretary of Veterans Affairs, Respondent.

Before DAVIS, *Chief Judge*, and PIETSCH and GREENBERG, *Judges.*

## O R D E R

On April 24, 2017, Douglas J. Rosinski filed through counsel a petition for extraordinary relief in the nature of a writ of mandamus. In it, he asks the Court to compel VA to provide him, in his capacity as an attorney representing claimants before VA, with access to newly completed but non-promulgated rating decisions for review and comment, a practice VA currently limits to veterans service organization (VSO) representatives. On April 27, 2017, Mr. Rosinski filed an opposed motion for aggregate action encompassing all similarly situated attorneys.

For the following reasons, the Court holds that, although it has jurisdiction to consider the validity of VA's policy with respect to the review of newly completed rating decisions, Mr. Rosinski has not demonstrated that he has standing to challenge the policy. The Court will, accordingly, dismiss the petition.

## I. BACKGROUND

VA affords VSO representatives with an opportunity to review newly completed rating decisions before they are promulgated. VA's *M21-1 Adjudication Procedures Manual* provides that the purpose of this review "is to identify any clear errors or matters of clarification that require significant discussion, and/or correction *prior* to promulgation." M21-1, pt. I, ch. 3, sec. B(3)(a).[1] Under this policy, once a decision is complete, a VSO representative has 48 hours to review it to resolve mistakes and request clarifications, but "[d]isagreements with a decision should be pursued through the appellate process." *Id.* sec. B(3)(c).

In January 2014, Mr. Rosinski first requested the ability to review his clients' newly completed rating decisions in the same manner afforded to VSO representatives; he sent follow-up requests in August 2014, September 2015, and February 2017. In March 2017, a VA representative responded to Mr. Rosinski's inquiry, stating that VA was "considering [his] request for access to draft rating decisions, and attorney access to draft decisions in general," but that it was not clear whether VA would ultimately grant the request. Petition, Exhibit (Ex.) G at 2. On

---

[1] VA amended the *M21-1* sections pertaining to VSO review of newly completed rating decisions on July 21, 2017, during the pendency of this matter. Although VA revised and reorganized some of the policy's language, the substance of the policy remains unchanged.

April 21, 2017, after further correspondence, a different VA representative informed Mr. Rosinski via email that VA was "unable to provide [him] the opportunity to seek clarification of unpromulgated rating decisions" but that it would "continue to study the matter." *Id.*, Ex. H.

Mr. Rosinski filed his petition on April 24, 2017, and subsequently filed his motion for aggregate action on April 27, 2017. On May 4, 2017, this case was submitted to a panel for decision pursuant to section I(b)(4) of the Court's Internal Operating Procedures. On June 1, 2017, the Court ordered the parties to file supplemental briefs addressing "the alleged disparate treatment of attorney practitioners at the regional office (RO) level, whether class action or some other form of aggregate action is warranted here, and any other matters deemed relevant by the parties." Thereafter, on July 11, 2017, the Court invited the participation of interested amici curiae. Between July 24, 2017, and September 6, 2017, the Court received the parties' supplemental briefs, as well as the briefs of three amici curiae: the National Veterans Legal Services Program and Military Order of the Purple Heart; the National Law School Veterans Clinic Consortium; and the Administrative Law, Civil Procedure, & Federal Courts Law Professors.[2] On September 20, 2017, the Court heard oral argument.[3]

## II. ARGUMENTS

In their briefing and at oral argument, the parties and amici focused on three general issues: first, whether the Court has jurisdiction over this matter, including whether Mr. Rosinski has standing to challenge VA's policy; second, whether a writ is warranted, including whether VA's policy is arbitrary and capricious; and finally, whether aggregate action is appropriate in this case.

### A. Jurisdiction

Mr. Rosinski contends that because VA's policy here constitutes a "[r]estraint[] of an attorney's ability to represent a veteran client," it is a "matter 'affecting the provision of benefits' and is thus within the Court's jurisdiction" under 38 U.S.C. § 5904. Petitioner's Brief (Br.) at 6. At oral argument, Mr. Rosinski clarified his argument, asserting that the Court has jurisdiction over this matter pursuant to 38 U.S.C. §§ 511 and 5904. Oral Argument (O.A.) at 07:54–08:06, *Rosinski v. Shulkin*, U.S. Vet. App. No. 17-1117 (argued Sept. 20, 2017), http://www.uscourts.cavc.gov/oral_arguments_audio.php. Mr. Rosinski also argues that he has standing to bring this challenge, as VA's policy causes him professional and economic harm. Specifically, he contends that the policy impedes his ability to provide competent representation, causing him to "miss the opportunity to provide [an] advocacy tool." O.A. at 13:08–:17. Mr. Rosinski does not contend that he has third-party standing on behalf of his clients. O.A. at 19:31–:37.

The Secretary responds that Mr. Rosinski lacks standing "because he does not explain how *he* has been, or imminently will be, injured by [VA]'s policy." Secretary's Response (Resp.) at 3.

---

[2] The Court thanks the amici curiae who responded to the invitation for their helpful briefing in this matter.

[3] Walton J. McLeod, of Columbia, South Carolina, argued for Mr. Rosinski. Mark D. Vichich, of Washington, D.C., argued for the Secretary; with him on the pleadings were Richard A. Daley, Deputy Chief Counsel; Mary Ann Flynn, Chief Counsel; and Meghan Flanz, Interim General Counsel. Angela K. Drake, of Columbia, Missouri, argued for amicus National Law School Veterans Clinic Consortium.

The Secretary rejects Mr. Rosinski's contention that VA's policy "affects his ability to 'effectively and efficiently' represent his clients," as Mr. Rosinski "fails to support [his arguments] with specific, concrete facts." *Id.* at 4 (quoting Petition (Pet.) at 9). In addition, the Secretary argues that the Court lacks subject matter jurisdiction over this matter, as "VA's policy to afford VSOs the opportunity to review rating decisions before they are finalized is a matter of internal VA administration, detached from any statutory enactment or even any regulations implementing a statute." *Id.* at 13; *see also* Secretary's Br. at 5 (characterizing this dispute as arising from VA's "gratuitous extension of a procedure to one class of representatives but not others"); *see also* O.A. at 49:24–:41 (linking VA's policy to the Secretary's discretionary authority under 38 U.S.C. § 5701).

## B. Merits of the Petition

Turning to the merits of the petition, Mr. Rosinski contends that a writ is warranted in this case. First, he argues that he lacks adequate alternative means to obtain relief, as "[t]he Secretary has stymied all other avenues" to do so and "has repeatedly refused to change the offensive policy despite no fewer than *eight* written and emailed requests." Petitioner's Br. at 16. Second, Mr. Rosinski asserts that VA's refusal to allow attorneys access to newly completed rating decisions in the same manner as VSO representatives "violates [his] rights as an accredited representative and his client's rights to fair process." Pet. at 4; *see also* Petitioner's Br. at 8 ("The Secretary's policy of allowing VSOs, and no one else, access to review draft rating decisions is arbitrary, disparate, and patently unfair."). He argues that the Secretary has offered no rationale or legal basis for his "discriminatory" policy, prejudicing "veterans who choose to exercise their right to attorney representation." Pet. at 5. As a consequence, Mr. Rosinski argues that claimants who are represented by attorneys are required to use the appeal process to correct factual errors and suggest relevant, overlooked regulations, resulting in delays in the resolutions of their cases.

Amicus National Law School Veterans Clinic Consortium argues that VA's policy is arbitrary and capricious, citing an example of an attorney, the director of a veterans law clinic, who contrary to VA's policy has been afforded the opportunity to review newly completed rating decisions. The amicus also argues that, because attorneys cannot charge a fee until a Notice of Disagreement is filed, attorneys and VSO representatives are similarly situated.

The Secretary responds that Mr. Rosinski is not entitled to a writ on the merits of his petition, as he has an alternative means of obtaining relief: namely, appealing a VA decision denying him access to newly created rating decisions. This is so, the Secretary contends, because Mr. Rosinski "did not bring the petition on behalf of any particular claimant" but instead brought the petition based on his "general inability to have this access in any of his client's cases, . . . relief that can be granted only prospectively." Secretary's Reply Br. at 9. In the alternative, the Secretary asserts that VA has a rational basis for treating VSO representatives and attorneys differently.

## C. Aggregate Action

In his motion for aggregate action and his subsequent briefing, Mr. Rosinski contends that aggregate action is necessary "to prevent a deluge of essentially identical cases," as the Secretary's policy affects all accredited attorney representatives. Petitioner's Br. at 23. Applying the criteria

set forth in Rule 23 of the Federal Rules of Civil Procedure, Mr. Rosinski argues that this case satisfies the "numerosity, commonality, typicality, and adequacy" requirements to certify classes in Federal district courts. *Id.* at 24. Finally, he contends that an aggregate action would "confer[] upon each class member the benefit of an inclusive court order and jurisdiction under that order to directly seek relief from violations" of the order. Petitioner's Reply Br. at 9.

The Secretary objects to aggregate action. He argues that "a single precedential order of this Court is all that is needed to afford relief," Secretary's Reply Br. at 12, because "the Secretary will be bound by that ruling in *all* cases in which attorney representatives seek pre-decisional review," Secretary's Br. at 23. He also argues that an aggregate action would run contrary to the interests of judicial economy, as the Court would be required to develop and carry out class action procedures in addition to ruling on the merits of the case.

### III. ANALYSIS

#### A. Jurisdiction

"'A party seeking the exercise of jurisdiction in its favor has the burden of establishing that such jurisdiction exists.'" *Disabled Am. Veterans v. Sec'y of Veterans Affairs*, 859 F.3d 1072, 1075 (Fed. Cir. 2017) (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 2001)). Before turning to the merits of Mr. Rosinski's arguments, then, the Court must satisfy itself that it possesses jurisdiction to act in this case. This inquiry involves two separate questions: first, whether the Court has subject matter jurisdiction over the dispute; and second, whether Mr. Rosinski has standing to challenge VA's policy.

#### 1. Subject Matter Jurisdiction

This matter arises under the All Writs Act, which authorizes the Court to "issue all writs necessary or appropriate in aid of [its] respective jurisdiction[] and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *see Cox v. West*, 149 F.3d 1360, 1363 (Fed. Cir. 1998) (holding that the All Writs Act "unambiguously applies" to the Court). The All Writs Act "does not expand a court's jurisdiction." *Cox*, 149 F.3d at 1363. "Rather, as explicitly stated in the [Act] itself, the Act provides for the issuance of writs 'in aid of' the jurisdiction already possessed by a court." *Id.* Thus, "[t]he propriety of a writ of mandamus in this case turns on the question of whether the Court . . . would have jurisdiction to review" this matter on direct appeal. *Bates v. Nicholson*, 398 F.3d 1355, 1359 (Fed. Cir. 2005).

Under 38 U.S.C. § 7252, the Court has "exclusive jurisdiction to review decisions of the Board of Veterans' Appeals [(Board)]." 38 U.S.C. § 7252(a). The Board, in turn, has jurisdiction to consider "all questions in a manner which under section 511(a) of this title is subject to decision by the Secretary." 38 U.S.C. § 7104(a). Section 511(a) states, in pertinent part, that "the Secretary shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans." 38 U.S.C. § 511(a). Therefore, "[t]he ultimate question before us is whether this case arises 'under a law that affects the provision of benefits.'" *Bates*, 398 F.3d at 1359; *see also Ledford*

*v. West*, 136 F.3d 776, 779 (Fed. Cir. 1998) (holding that this Court's "jurisdiction is premised on and defined by the Board's decision concerning the matter being appealed").

Both this Court and the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) have clarified the types of matters that fall within the Court's jurisdiction. *See, e.g.*, *Cox*, 149 F.3d at 1364-65 (holding that the Court had jurisdiction to compel VA to pay attorneys' fees pursuant to 38 U.S.C. §§ 511 and 5904(d)); *Freeman v. Shinseki*, 24 Vet.App. 404, 413-15 (2011) (holding that the Court had jurisdiction to review the Secretary's appointment of fiduciaries pursuant to 38 U.S.C. § 5502). Most recently, in *Chisholm v. McDonald*, this Court held that it had jurisdiction to review the Secretary's "authorizing or denying access to electronic records for counsel seeking benefits on behalf of their clients," because 38 C.F.R. § 14.629—the regulation governing such access—was promulgated pursuant to 38 U.S.C. §§ 501(a) and 5904. 28 Vet.App. 240, 242.

These cases follow the Federal Circuit's clarification in *Bates* that a "law that affects the provision of benefits" means "a single statutory enactment that bears a Public Law number in the Statutes at Large." 398 F.3d at 1361. In each case, the jurisdictional question turned on either a statute enacted as part of a law affecting benefits or a regulation promulgated pursuant to such a statute.

In this case, the *M21-1* provision at issue—M21-1, part I, chapter 3, section B(3)—does not expressly flow from a statute or regulation.[4] The Secretary argues that it is promulgated pursuant to 38 U.S.C. § 5701(d), which provides that the Secretary "as a matter of discretion may authorize an inspection of Department records by duly authorized representatives of recognized organizations." 38 U.S.C. § 5701(d); *see* Secretary's Br. at 15-16. Mr. Rosinski, in contrast, contends that the policy derives from section 5904, which governs attorney representation before VA. The Court need not decide whether VA's policy is authorized by section 5701 or 5904 because, regardless of which statute is invoked, the Court is satisfied that it has jurisdiction.

The Court holds that section 5701 is a "law affecting the provision of benefits" for the purposes of section 511. As the Secretary notes, section 5701(d) traces its origins to Veterans Regulation 11, created in March 1933 by Executive Order 6099. *See* Exec. Order No. 6099 § I(g) (Mar. 31, 1933) (providing that the "Administrator of Veterans' Affairs in his discretion may authorize an inspection of Veterans' Administration records by duly authorized representatives of recognized organizations"). This provision was later codified in title 38 of the Code of Federal Regulations by Public Law 85-857, which "consolidate[d] into one Act all of the laws administered by [VA]." *See* Pub. L. No. 85-857, § 3301, 72 Stat. 1105, 1236 (1958). Applying the Federal Circuit's reasoning in *Bates*, section 5701(d)—included in Public Law 85-857—is a "law that affects the provision of benefits." 398 F.3d at 1361. To the extent that the Secretary appears to

---

[4] This lack of a citation to an express authority appears to be contrary to Congress's mandate that "[a]ny rule, regulation, guideline, or other published interpretation or order . . . shall contain citations to the particular section or sections of statutory law or other legal authority upon which such issuance is based." 38 U.S.C. § 501(b).

In his initial response to the petition, the Secretary argues that the policy "is a matter of internal VA administration, detached from any statutory enactment or even any regulations implementing a statute." Secretary's Resp. at 13. This cannot be the case—VA, like all Federal agencies, "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Therefore, VA's policy must derive from some statutory or regulatory authority.

contend that the discretion afforded by 5701(d) shields VA's policy from review, his argument confuses the jurisdictional question of whether the action arises out of a law affecting the provision of benefits with the merits question of whether the Secretary abused his discretion under the statute.

Likewise, both this Court and the Federal Circuit have expressly held that section 5904 falls within the Court's jurisdiction. *See, e.g., Cox*, 149 F.3d at 1364-65. Thus, under either proposed authority, the Court has subject matter jurisdiction; neither party cites any contrary authority. *Cf. Freeman*, 24 Vet.App. at 415 ("[U]nless Congress *explicitly* prohibits it, there is a strong presumption in favor of judicial review."). Thus, regardless of whether the VA policy regarding newly created rating decisions derives from section 5701 or 5904, the Court has subject matter jurisdiction over this matter.

## *2. Standing*

Separate and apart from the jurisdictional limits set by section 7252, this Court has "adopt[ed] as a matter of policy the jurisdictional restrictions of the Article III case or controversy rubric." *See, e.g., Mokal v. Derwinski*, 1 Vet.App. 12, 15 (1990). In *Swan v. Derwinski*, the Court recognized that the "case or controversy" requirement included a "requirement that a litigant have standing, which 'is perhaps the most important of [the "case or controversy"] doctrines.'" 1 Vet.App. 20, 22 (1990) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)); *see also Matter of Stanley*, 9 Vet.App. 203, 209 (1996) ("This standing requirement emerges from the case-or-controversy requirement in Article III, Section 2, of the U.S. Constitution, a jurisdictional restraint to which this Court has held it will adhere.").

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, . . . and (b) 'actual or imminent, not "conjectural" or "hypothetical[.]"'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). "Second, there must be a causal connection between the injury and the conduct complained of . . . ." *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

"'The party invoking federal jurisdiction bears the burden of establishing' standing . . . ." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (quoting *Defs. of Wildlife*, 504 U.S. at 561). "A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore*, 495 U.S. at 155-56. Courts must, however, "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

The parties' dispute with respect to standing centers on whether Mr. Rosinski satisfies the first element above—that is, whether he has suffered an injury in fact that is concrete, particularized, and actual or imminent. As an initial matter, at oral argument, Mr. Rosinski did not argue that he possessed third-party standing, O.A. at 19:31–:37, and the Court will not address standing based on injuries to his current or hypothetical future clients. *See Amnesty Int'l USA*, 568 U.S. at 411-12.

Mr. Rosinski premises his standing on two alleged injuries in fact: first, that the policy interferes with his ability to practice law and provide competent representation; and second, that he may suffer economic harm because of the policy. Turning first to the assertion that VA's policy may cause him economic harm, the Court holds that Mr. Rosinski has not established an injury in fact. He cites no evidence that he has personally suffered economic harm, nor has he demonstrated that such harm is imminent. *But see* Petitioner's Br. at 19 (noting that VA's policy may "result[] in *higher* attorney fees in contingency fee matters" (emphasis added)). Instead, the *possibility* of economic harm is mere conjecture and, accordingly, cannot serve as a basis for standing. *See Whitmore*, 495 U.S. at 155; *Nw. Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) ("Where there is no current injury, and a party relies wholly on the threat of future injury, the fact that the party (and the court) can 'imagine circumstances in which [the party] *could* be affected by the agency's action' is not enough." (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688-89 (1973))).

Likewise, Mr. Rosinski has not demonstrated an injury sufficient to give rise to standing with respect to his ability to practice law or provide competent representation. The U.S. Supreme Court has generally recognized a protected right "'to engage in any of the common occupations of life.'" *Bd. of Regents v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); *see Conn v. Gabbert*, 526 U.S. 286, 290-91 (1999) (holding that the "Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation"). Citing this interest, the Supreme Court has invalidated "complete prohibition[s] of the right to engage in a calling," but not "brief interruption[s]." *Conn*, 526 U.S. at 292.

Here, although Mr. Rosinski argues that VA's policy prevents him from effectively and zealously representing his clients by depriving him of an advocacy tool, he has not demonstrated that VA's policy prevents him from representing his clients. On the contrary, the Secretary correctly notes that existing VA policies afford him the ability to achieve the same results—i.e., correction of errors in rating decisions. For example, the *M21-1* provides that the RO

> must . . . correct the *Narrative* section of a rating decision if *after* the claimant has been notified of the decision it is discovered that
>
> - inaccurate information was provided such as service dates or entitlements, and/or
>
> - incomplete information was provided to the claimant, such as criteria for the next higher evaluation, or a change of law applicable to the pending claim.

M21-1, pt. III, subpt. iv, ch. 7, sec. B(3)(a); *see also id.*, sec. B(3)(b) (requiring correction of errors on the rating codesheet, including disability evaluations, effective dates, and diagnostic codes); *id.*, sec. B(3)(c) (requiring referral of an erroneous decision "to a decision maker to issue a new decision" once an error has been identified).

7

To the extent that Mr. Rosinski cites increased delay in adjudication under these alternative procedures, that delay, if any, may be an injury to his clients, not to him. Finally, to the extent that Mr. Rosinski postulates that he may lose, or fail to attract, clients because of VA's policy, that allegation, without more, is too speculative to constitute actual or imminent harm. *See Amnesty Int'l USA*, 568 U.S. at 411 (holding that a theory of standing premised on "a highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending"); *Nw. Airlines, Inc.*, 795 F.2d at 201. Significantly, Mr. Rosinski offers no proof that he has actually lost or failed to attract a client because of his inability to review newly created rating decisions. Indeed, when pressed at oral argument, Mr. Rosinski's counsel could not articulate *any* specific economic injury to Mr. Rosinski caused by VA's policy. *Compare* O.A. at 15:00–:14 ("I believe the economic harm results in, by denying the access and the process for his clients, the inevitable result is the delay and the loss of the ability to secure fees."), *with* O.A. at 13:48–:59 (noting that a clerical error "delayed the result that needed to be reached and it also created an economic harm also for his client, resulting in a larger fee later down the road").

The Court cannot conclude that VA's policy interferes with Mr. Rosinski's ability to practice law to an extent necessary to give rise to standing. Therefore, because Mr. Rosinski has not demonstrated that he suffers, or will imminently suffer, an injury in fact, he has no standing to bring this challenge, and the Court will dismiss the petition.[5] *See Amnesty Int'l USA*, 568 U.S. at 411-12; *Whitmore*, 495 U.S. at 155-56.

## B. Aggregate Action

In *Monk v. Shulkin*, the Federal Circuit reversed 26 years of this Court's precedent and held that the Court has the "authority to certify and adjudicate class action cases . . . under the All Writs Act, other statutory authority, and the [Court]'s inherent powers." 855 F.3d 1312, 1318 (Fed. Cir. 2017). Since the Federal Circuit's decision in *Monk* issued, this Court has not yet had occasion to consider the scope of that authority; indeed, Mr. Monk's remanded case remains pending. *See Monk v. Shulkin*, U.S. Vet. App. No. 15-1280 (submitted to en banc panel Aug. 10, 2017).

Although this Court has not yet determined what form any aggregate action procedures will take, it finds one principle applicable to class actions under Rule 23 of the Federal Rules of Civil Procedure instructive in this case—namely, the requirement that a putative class representative's claims be "typical" of the class. *See* FED. R. CIV. P. 23(a)(1). Here, because Mr. Rosinski has not demonstrated that he has standing to challenge VA's policy regarding newly created rating decisions, he has not shown that he asserts a claim typical of a class—indeed, lacking standing, he has no justiciable claim at all. Absent some claim for which Mr. Rosinski may serve as a class representative, the Court sees no basis to grant his motion for aggregate action, and it will, therefore, deny the motion. *See O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

---

[5] To be clear, the Court does not hold that attorneys *categorically* lack standing to challenge VA's policy, only that Mr. Rosinski has not demonstrated that he has standing on the facts of this case. *See Amnesty Int'l USA*, 568 U.S. at 411-12. Under the appropriate facts, such as a showing of actual economic harm, an attorney may have standing to challenge this policy.

# IV. CONCLUSION

For the foregoing reasons, the Court holds that Mr. Rosinski lacks standing to challenge VA's policy regarding newly created rating decisions. Accordingly, the Court will dismiss the petition and deny Mr. Rosinski's motion for aggregate action.

On consideration of the foregoing, it is

ORDERED that Mr. Rosinski's April 27, 2017, motion for aggregate action is denied. It is further

ORDERED that the petition is DISMISSED.

DATED:  January 26, 2018                                  PER CURIAM.


DAVIS, *Chief Judge*, concurring: I write separately to emphasize how disturbing it is to me to see the efforts of an attorney to get a straight answer from the Secretary over a 4-year period thwarted, only to be told that VA was "unable to provide [him] the opportunity to seek clarification of un-promulgated rating decisions but that it would continue to study the matter." First, it is preposterous that the Secretary took 4 years to respond to Mr. Rosinski's very simple, clear, and direct requests to review newly created rating decisions for error correction. Second, in addition to the timing problem, the Secretary's policy—which discriminates against attorneys in favor of VSOs—lacks any persuasive and still viable rational basis. In a different posture, I would have found that Mr. Rosinski had standing and would have declared the Secretary's policy arbitrary and capricious.

Third, although there is a long history of both a "special relationship" between VA and VSOs and restrictions on attorney practice before VA, the practical differences between VSO and attorney representation are less significant now than they have ever been. *See, e.g.*, 38 C.F.R. § 3.103(e) (2017) ("[C]laimants are entitled to representation of their choice at every stage in the prosecution of a claim."). Moreover, since 1933, when VA presumably established its practice of allowing VSO representatives to review newly completed rating decisions, attorneys have been afforded more opportunities to represent clients and have become more active in Agency adjudications.[6] *See* Veterans Judicial Review Act of 1988, Pub. L. No. 100-687 § 104, 102 Stat. 4105 (repealing $10 limit on attorney fees for representing VA claimants after a Notice of Disagreement has been filed); Veterans Appeals Improvement and Modernization Act of 2017, Pub. L. No. 115-55 § 2(n), 131 Stat. 1105 (2017) (allowing attorneys to charge fees in connection with filing a Notice of Disagreement).

The increased involvement of attorneys in the adjudication process, both at the adversarial and nonadversarial stages, suggests that the disparate treatment of VSO representatives and attorneys has perhaps outlived its usefulness and may no longer be rationally justified. Indeed,

---

[6] At the Board level, attorney representation has increased from 3.4% of all cases decided by the Board in 1996 to 14.3% in 2016. *Compare* BOARD OF VETERANS' APPEALS FISCAL YEAR 1996 REPORT OF THE CHAIRMAN 42 (1996), *with* BOARD OF VETERANS' APPEALS ANNUAL REPORT 26 (2016).

although there once may have been a logical reason to grant VSO representatives but not attorneys access to draft rating decisions, it is not clear to me that those reasons remain. There is no evidence that providing attorneys with access to newly completed rating decisions would unduly burden VA. On the contrary, the Secretary concedes that any attorney who currently has access to a client's electronic claims folders can view newly completed rating decisions before they are promulgated. O.A. at 1:04:27–:33 ("Any person who has [electronic claims file] access, even if it's an attorney, can see these draft decisions.").

Fourth, it is not clear that attorney review of newly completed rating decisions would result in an increased number of readjudications. In Fiscal Year 2016, VSO representatives reviewed newly completed decisions in 36% of their cases. O.A. at 52:30–53:49. VA does not track whether these reviews resulted in the identification of errors in those decisions. *Id*. However, VA's internal quality review process indicates that roughly 10% of rating decisions involving VSO representatives are sent back for correction of an error prior to promulgation, compared to roughly 11% of cases involving attorney representatives. O.A. at 59:23–1:00:52. Based on these statistics, the aggregate effect of VSO representatives' review of newly completed rating decisions does not appear to be significant.

The Secretary contends that it would be difficult for VA to justify not providing access to unrepresented veterans if it extended such access to attorneys, and he raises legitimate arguments regarding both the administrability of allowing unrepresented veterans access to newly completed rating decisions and the effect of this Court's decision in *Sellers v. Shinseki*, 25 Vet.App. 265 (2012), on such review.[7] O.A. at 1:05:49–07:10. Although I understand the Secretary's concern, it is troubling that he appears to be relying on the mere fact that it may be difficult for VA to change its policy to justify giving some veterans an extra chance to correct errors while denying that opportunity to others.

Finally, even assuming VA has valid reasons to limit its policy to VSO representatives, I am deeply troubled by the assertions of amicus National Law School Veterans Clinic Consortium that the policy has not been consistently enforced. The Secretary's response to these concerns at oral argument was less than satisfying. *See* O.A. at 1:08:08–:48 ("If that means that someone in the [RO] thought that attorneys do have the ability to suggest changes and point out mistakes for correction, that's incorrect . . . . It does appear that maybe somebody at the [RO] mistakenly thought that this 48-hour review applied to attorneys, and that's incorrect."). If, as the amicus contends and the Secretary seems to concede, VA has afforded some attorneys associated with law school clinics the ability to review newly completed rating decisions despite its stated policy to the contrary, then VA's implementation of its policy is arbitrary and capricious on its face.

Regardless of the next steps taken by VA and Mr. Rosinski in the wake of this order, I encourage VA to reflect on its policy, consider whether the justifications behind it and enforcement of it are consistent with the current realities of attorney and VSO practice, and make the review process available to all or to none.

---

[7] In *Sellers*, the Court held that, under certain circumstances, actual notice of a draft rating decision by a veteran could transform that decision into a final, binding decision. 25 Vet.App. at 279.

GREENBERG, *Judge*, dissenting:  I respectfully dissent because I would have concluded and I would have held that we have exclusive jurisdiction to hear this case.  The petitioner has standing.  The petition should have been granted either because of an injury in fact or because an injury in fact need not be alleged.  The practice complained of is patently arbitrary, capricious and unreasonable, and I would have so held.  At the very least it violates the letter and spirit of the Administrative Procedure Act, and may also rise to a matter of constitutional dimension.  Further, I would have certified a class consisting of lawyers like the petitioner.  I would have concluded that class certification was necessary and proper.  I would have ordered notice, at very little cost to the Government, through existing electronic means at the U.S. Department of Defense and the U.S. Department of Veterans Affairs to all ROs, lawyers, and litigants.  In addition, I would have ordered suitable notice in all Department of Veterans Affairs facilities, similar to HIPAA notices, and emergency room notices of rights (many in foreign languages).  Veterans surely have as much right to notice as all others.  Finally, I would have granted attorney fees and costs in accordance with the Equal Access to Justice Act, upon the filing of a suitable affidavit of services.

I agree with Justice Brennan,[8] that "[d]issent for its own sake has no value . . . . However, where significant and deeply held disagreement exists, members of the Court have a responsibility to articulate it. . . . Unanimity is not in and of itself a judicial virtue. . . . Judges have no power to *declare* law.  Courts *derive* legal principles and have a duty to explain *why* and *how* a given rule has come to be. . . . [Judges] are forced by a dissent to reconsider the fundamental questions and rethink the result . . . .  In my judgment. . . the unique interpretive role of [our Court] with respect to the Constitution [and our authority] demands some flexibility with respect to the call of stare decisis. . . . [We should not be] captive to the anachronistic view of long-gone generations. . . . The right to dissent is one of the great and cherished freedoms by reasons of the excellent accident of our American births."  William J. Brennan, *In Defense of Dissents*, 37 HASTINGS L.J. 427, 427-35 (1985) (emphasis in original).

"In cases involving benefits owed to veterans, Congress has created a scheme conferring exclusive jurisdiction over claims affecting veterans' benefits to some federal courts, while denying all other federal courts any jurisdiction over such claims."  *Veterans for Common Sense v. Shinseki,* 678 F.3d 1013, 1020 (9th Cir. 2012) (en banc) (Bybee, J.), *cert. denied*, 568 U.S. 1086 (2013).  We have been given broad direction to "use class actions to promote efficiency, consistency, and fairness in its decisions" through our authority to issue writs.  *Monk v. Shulkin*, 855 F.3d 1312, 1321 (Fed. Cir. 2017) (Reyna, J.).

The majority ignores this command, using the excuse of standing to "slam the courthouse door against" the petitioner.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 159, 178 (1970) (Brennan, J., concurring in result and dissenting).  The conclusion that the petitioner did not suffer an economic injury in fact ignores the realities of conducting a law practice, as well as the concept of net present value.  It is wrong to suggest that simply because further VA delay may result in higher back pay and therefore a larger contingency fee, the petitioner has not been

---

[8] William J. Brennan, Jr., was a New Jersey lawyer who tried cases.  He was a partner in one of the largest and most distinguished law firms, and specialized in labor litigation.  He was appointed to the Supreme Court of New Jersey by Governor Driscoll and to the Supreme Court of the United States by President Eisenhower.  He served from 1956 to his retirement in 1990.  In the Term in which he made the speech resulting in the law review article extensively referred to here, he wrote forty-two dissents.

harmed by this practice.  A practitioner bears the opportunity cost of representing other clients if he is forced through a lengthy appeal that could have been avoided with an equal application of the *M21-1* provision in question. Furthermore, because back pay awards are dispersed without interest, the longer the receipt of his attorney fees is delayed, the less valuable the fees. It is fallacy to suggest that the petitioner's harm is at best speculative because he fails to cite specific clients affected by the policy. The opportunity costs borne by the petitioner burden him every time a case is delayed by the inequitable VA policy.

Moreover, the petitioner is not required to establish specific cases of economic injury: When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (Thomas, J.).  A party complaining of an equal protection violation need only show that it was able and willing to seek the benefit but was unable to do so on an equal basis with those in another group. *See id*. at 666; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (O'Connor, J.).

The petitioner, and all similarly situated attorneys, are unable to advocate for their veteran clients on an equal footing with VSO representatives. *See* M21-1 ADJUDICATION PROCEDURES MANUAL, pt. I, ch. 3, sec. B(3)(a) (a VSO representative, and only a VSO representative, may "identify any clear errors or matters of clarification that require significant discussion, and/or correction *prior* to promulgation" (emphasis in original)). Regardless of outcome, the petitioner is on the wrong side of historical favoritism, preventing his ability to correct clear errors of draft rating decisions prior to their promulgation, and has thus suffered an injury in fact. *See Ne. Fla. Chapter of Assoc. Gen. Contractors of Am.*, 508 U.S. at 666.

As early as the First Judiciary Act, chapter XX, section 35, 1 Stat. 73 (1789)[9], Congress has encouraged the broadest possible access to United States courts. Section 35 provides in pertinent part as follows: "*[A]nd be it further enacted, that in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein.*" (emphasis added). Yet, here lawyers are substantially restricted in the management of *causes* by the inability to access the same information available to others.

Reflective as section 35 is of the will of the original Congress, it is not necessary to resolve the issue of standing, *see discussion supra*. In dismissing the petition, the majority recklessly ignores the risks of catastrophic delay that may plague the veterans represented by the petitioner and similarly situated attorneys. *See Hayburn's Case*, 2 U.S. (2 Dall.) at 410, n. (1792) (Jay, C.J.) ("[M]any unfortunate and meritorious [veterans], whom Congress have justly thought proper

---

[9] William Paterson, a New Jersey lawyer, and author of much of the first Judiciary Act as a United States Senator, was later appointed a Justice of the U.S. Supreme Court by President George Washington.  He was among the first Justices to file a dissent.  *See Simms v. Slacum,* 7 U.S. (3 Cranch) 300, 309 (1806).

12

objects of immediate relief, may suffer great distress, even by a short delay, and may be utterly ruined, by a long one.").

On average, an appeal from an RO takes almost five years to be finally decided by the Board. *See* Board of Veterans' Appeals Annual Report Fiscal Year 2016, http://www.bva.va.gov/docs/Chairmans_Annual_Rpts/BVA2016AR.pdf (last seen Dec. 28, 2017). The difference between receiving a lawful decision at the RO and receiving an erroneous decision requiring an appeal is life changing for many veterans. In that waiting period, how are a disabled veteran's bills to be paid? How are their families going to be cared for? Are we as a Court willing to exacerbate the problem of an abundance of homeless veterans? Why are we here, if not to prevent or ameliorate an injustice?

The Secretary has a fiduciary duty to all veterans. Is he not therefore responsible to all veterans, their lawyers, or other surrogates to treat them equally? Who can argue with the notion, whether in the context of an adversary proceeding or not, that denial of equal access to important and often dispositive governmental determinations, is of supreme importance? Here, the question of standing should be self-evident. *See, e.g.*, *Driscoll v. Burlington-Bristol Bridge Co.*, 8 N.J. 433 (1952) (Vanderbilt, C.J.).[10] Are we to become just another of the cascading impediments faced by veterans seeking the benefits conferred by Congress? *See* Dave Phillips, *At Veterans Hospital in Oregon, A Push for Better Ratings Puts Patients at Risk, Doctors Say,* N.Y. TIMES, Jan. 1, 2018, at A1, A12.

I would have held that the *M-21* provision was arbitrary, capricious, and unreasonable. I would also have held that such a policy was inconsistent with the mandates of the Administrative Procedure Act. *See* Administrative Procedure Act, ch. 324, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §§ 551-559, 701-706, 1305, 3105, 3344, 4301, 5335, 5372, 7521). I would have granted aggregation, invalidated this arbitrary provision, and provided the remedy necessary to immediately place all who represented veterans on an equal footing.

I remind the Court that class action "was an invention of equity . . . mothered by the practical necessity of providing a procedural device so that mere numbers would not disable large groups of individuals, united in interest, from enforcing their equitable rights nor grant them immunity from their equitable wrongs." *Montgomery Ward & Co. v. Langer,* 168 F.2d 182, 187 (8th Cir. 1948). The Federal Circuit's statement that class action litigation at our Court would "promote efficiency, consistency, and fairness," is entirely consistent with this edict. *Monk*, 855 F.3d at 1320. The import of this statement is that our practice of issuing precedential decisions currently is not adequately accomplishing these goals.

This is an understandable position given that when a precedential decision is issued by the Court, VA provides little transparency regarding how it is effecting our decisions. The Court is often left to wonder whether its decisions are actually applied quickly, correctly, and uniformly, which is especially troubling for a system wrought with delay and bureaucracy. *See Staab v.*

_____

[10] Arthur T. Vanderbilt was one of the finest New Jersey trial attorneys. He was president of the American Bar Association, dean of the New York University School of Law, architect of the great New Jersey Constitution of 1947, expert on the life and professional career of Lord Mansfield, and, from 1948 to 1957, chief justice of the New Jersey Supreme Court.

*McDonald,* 28 Vet.App. 50 (2016) (Greenberg, J); *see also* O.A. at 1:19:47-:20:49 (the Court attempted to ascertain the status of claims relevant to the Court's decision and the Secretary was unable to provide *any* information). There can be no doubt that included in the Federal Circuit's class action command is the instruction that the Court must control the enforcement of its decisions when it would aid in the promotion of "efficiency, consistency and fairness." *Monk*, 855 F.3d at 1320.

Here, the ability to craft a remedy and to control its enforcement are why a class action is necessary. Class action litigation would provide the Court with the means of ensuring that equal access to draft rating decisions is made mandatory, without forcing an individual claimant to endure the lengthy and painful appeals process.

I believe "[t]he better road to follow, until we are clearer as to the shape of the class-suit needs in this court and the functioning of various class-suit devices, is to proceed on a case-by-case basis, gaining and evaluating experience as we study and decide the class-suit issues presented by individual, concrete cases coming up for resolution. If we ultimately adopt a general rule, it will be in the light of this *ad hoc* experience." *Quinault Allottee Ass'n & Individual Allottess v. United States*, 453 F.2d 1272, 1276 (Fed. Cl. 1972).

I would certify a class of attorneys that practice before VA, hold that the current policy is arbitrary and capricious, order VA to properly notify RO employees and the Court-certified class of attorneys of the Court's ruling, and instruct VA inform the Court when these actions have been completed. I would also appoint a special master to supervise all the Court's orders and retain jurisdiction. This matter offered an opportunity for the Court to begin to wield its power to better the VA benefits system through aggregation, and the majority's dismissal based on a lack of standing suggests that the Court is still not ready to grow and be the Court that Congress intended.

"Where is the Man to be found, who wishes to remain indebted, for the defence of his own person and property, to the exertions, the bravery, and the blood of others, without making one generous effort to repay the debt of honor and gratitude? In what part of the Continent shall we find any Man, or body of Men, who would not blush to stand up and propose measures, purposely calculated to rob the Soldier of his Stipend, and the Public Creditor of his due? and were it possible that such a flagrant instance of Injustice could ever happen, would it not excite the general indignation, and tend to bring down, upon the Authors of such measures, the aggravated vengeance of Heaven?" Letter from George Washington, *Circular to State Governments* (June 8, 1783), GEORGE WASHINGTON SELECTED WRITINGS, 205, 211 (Library of America Paperback Classics eds., 2011).

For these reasons, I dissent.